UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | Case No. 4:05CR00161 HEA (AGF) |
| DEANDRE THOMPSON, | ) | |
| | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

This matter is before the Court on the pretrial motion filed by Defendant, Deandre

Thompson. Pretrial matters were referred to the undersigned United States Magistrate

Judge under 28 U.S.C. § 636(b). Defendant filed a motion to suppress evidence and

statements. (Doc. No. 17). An evidentiary hearing was held on September 8, 2005. The

government was represented by Assistant United States Attorney Patrick T. Judge.

Defendant was present and represented by his attorney, Assistant Federal Public

Defender Janis C. Good. At the hearing, the government presented the testimony of

Officer Mark McMurray, who has been employed as a police officer with the St. Louis

Metropolitan Police Department (SLMPD) for almost twelve (12) years.

At the hearing, an issue arose regarding Defendant's request to testify contrary to

his attorney's advice. At the request of defense counsel, the parties were given the

opportunity to submit briefs both on whether defense counsel could preclude Defendant

from testifying and on the admissibility of the grand jury testimony of a witness who is

now deceased. A further hearing was scheduled for September 21, 2005. Prior to the

continued hearing, Defendant requested the appointment of new counsel, and defense counsel filed a motion to withdraw. Following a hearing, a portion of which was conducted outside the hearing of the government, Defense counsel's motion to withdraw was granted and new counsel was appointed to represent Defendant.

A status conference was held on September 30, 2005, at which Defendant appeared with his new attorney, Steven V. Stenger. At the status conference, Defendant and his attorney confirmed that Defendant did not wish to testify. Defense counsel requested that the hearing be continued to allow him additional time to evaluate and possibly present the testimony of other witnesses, and the hearing was continued to October 28, 2005.

At the hearing on October 28, 2005, Defendant presented the testimony of Defendant's eleven-year-old sister, Ebone Smiley. After further consultation with counsel, Defendant again confirmed his decision not to testify at the hearing.

Although defense counsel did not offer the testimony because he believed it did not add anything to the evidence presented, Defendant himself requested, both orally and in writing (Doc. No. 34), that the Court review the testimony of the preliminary examination hearing that was held on July 30, 2003 regarding an earlier criminal complaint related to these same events. United States v. Deandre Thompson, Case No. 4:03MJ1141 TIA, before Magistrate Judge Terry I. Adelman.[1] A copy of the digital

_____

[1] A criminal complaint was filed against Defendant on July 26, 2003, Case No. 4:03MJ1141 TIA, related to these same events. The preliminary examination and detention hearing were held on July 30, 2003. The complaint was dismissed by the government (Doc. #7) on August 21, 2003. The undersigned agrees with defense

recording of the proceedings was obtained, and on November 4, 2005 the undersigned listened to the entire recording of that hearing, after which time the matter was taken under submission.

Based on the testimony and evidence adduced and having had an opportunity to observe the demeanor and evaluate the credibility of the witnesses, the undersigned makes the following findings of fact and conclusions of law.

## FINDINGS OF FACT

On July 25, 2003, the police were advised that a burglary had taken place early that morning in St. Ann, Missouri, at the Trail Creek Trade Company ("Trail Creek"), which sells firearms and other items. The St. Ann police were advised that several dozen firearms, including handguns and rifles, were stolen, but the owners had not yet been able to identify exactly which firearms had been stolen.

Soon after the burglary, Detective Day Laterlie (phonetic spelling), who is employed with the St. Ann Police Department, received information from a confidential informant (CI) who had provided information to Det. Laterlie and proven reliable in the past. The CI was also known to Officer McMurray and had provided information to him in the past that had proven to be correct. The CI advised Det. Laterlie that an individual known to the CI, named "Dee," and others had used a stolen minivan in connection with the Trail Creek burglary. The CI described the minivan, provided the license plate

_____

counsel's assessment that the testimony from the 2003 preliminary hearing adds little, if anything, to the evidence and testimony received in this case. At Defendant's request, however, a transcript will be made of the hearing.

number, and advised Det. Laterlie that the minivan could be found in the area of Kossuth & Camellia.

Because the location provided was in the City of St. Louis, Officer McMurray and others from the SLMPD were contacted for assistance.  Det. Laterlie advised the officers of the burglary and of the information he had received.   Based on this information, officers from the SLMPD, including Officer McMurray, Detective Stone and Detective Sergeant Diva, met Det. Laterlie and others at Kossuth & Camellia.  There were approximately eight officers in all.  They observed a minivan that matched the description given and began to conduct surveillance.  Their surveillance was interrupted by some other police business, and they returned to where the minivan was parked at approximately 1:00 p.m.[2]   One of the officers ran the Vehicle Identification Number (VIN) and confirmed that the minivan had been reported stolen, and that the plates on the minivan were also stolen.

While they were investigating the minivan, two females passed by.  They said they lived on the block and inquired if there was a problem with the minivan.  The women advised the officers that the van was "Dee's."  They said that "Dee" lived around the corner and pointed out the house where he lived.  The officers then proceeded to 4493 Kossuth, the house that had been identified by the women.  Det. Laterlie, Officer McMurray, and perhaps one or two other officers, approached the front door of the

---

[2]  Apparently the officers were required to attend to other police business related to the burglary that resulted in an arrest, and they then returned to the area where the minivan was located.  The details of the other police business were not deemed relevant by either party and were not further provided at the hearing.

residence, while the other officers remained on the street. The officers were in plain clothes, but all were wearing vests, jackets, or other items that clearly identified them as police. The outside door was open, and there was a screen door that was closed. The officers were able to see three individuals inside. One of the individuals, who identified himself as Charles Miller, came to the door and spoke with Det. Laterlie. Mr. Miller was an elderly man, approximately 70 years old. Detective Laterlie identified himself as a police officer and asked Mr. Miller if they could come in. He said yes. The officers asked if the owner of the house was present, and Mr. Miller said the house was his sister's but that she was ill and he was looking after the house for her. Det. Laterlie asked if he knew someone named "Dee," and Mr. Miller said that Dee was his nephew and in response to their questions stated that Dee lived there. Mr. Miller said that Dee was home and indicated that he was in the back bedroom. Det. Laterlie asked if they could go back there to look for Dee, and Mr. Miller said "yes." Mr. Miller did not appear to be under the influence of drugs or alcohol, appeared to understand what was being said, and gave clear responses to the officer's questions. His manner was cooperative throughout.

The house on Kossuth is a single-family residence. The living room is located in front, there is a bedroom to the right, a hallway that leads to the kitchen, and a second bedroom toward the back, where Mr. Miller had said Dee could be found. Det. Laterlie, Officer McMurray, and one or two other officers went to the back bedroom. Although Officer McMurray did not have his firearm drawn, other officers did have their firearms drawn. The door to the bedroom was mostly but not entirely closed, and the officers could hear that there was someone inside.

The officers opened the bedroom door and saw a man, later identified as Defendant Thompson, and a woman. The two were naked and were on a mattress or pad that was on the floor. The woman jumped up and tried to shield herself, and Defendant also stood up. A total of three or four officers entered the bedroom. They asked Defendant to lay on the floor, and he complied. After retrieving some clothing for the female, Det. Laterlie asked Defendant his name, and he replied, "Dee." When asked for his full name, he identified himself as Deandre Thompson. Det. Laterlie asked Defendant where his clothes were, and Defendant pointed to some blue jeans and other clothing located on the floor to the side of the mattress. On the floor near Defendant's clothing, the officers also saw several tools in plain view, including a bolt cutter, crowbar, hammer, and flashlight, which they associated with burglary tools based on their experience. Det. Laterlie went to retrieve the clothing, and as he lifted the blue jeans he saw a firearm that had been under the pants.

Defendant and the woman were both placed in handcuffs, and the firearm and tools were seized. The firearm was later identified as one of the items stolen during the burglary that morning. Det. Laterlie advised Defendant of his Miranda rights from a department card that he had with him, and Defendant indicated that he understood his rights. At that point, Defendant made a statement regarding the firearm and stated that the pants were not his. No threats or promises were made by the officers to induce Defendant to make his statement. Although the timing when these seizures occurred is unclear, the officers also seized other items from the bedroom, including a gun catalogue that matched magazines from inside Trail Creek, some rubber gloves, a belt, an ignition

key that matched the minivan, an address book from Defendant's pants, and Defendant's wallet and ID. Because there were scuff marks on the wall of the Trail Creek store, the officers also seized several pairs of Defendant's shoes. Inside Defendant's wallet they found a gun tag that contained handwritten information associating it with the Trail Creek store. It pertained to a different firearm than the one they found in the bedroom. When asked about the gun tag, Defendant stated that it didn't matter because he was going to "take the case."

After Defendant's arrest, the officers returned to Mr. Miller in the living room and presented him with a department Consent to Search form. Govt. Ex. B. They had not presented the form to him earlier, due to safety concerns, as the crime they were investigating involved the theft of multiple firearms. Det. Laterlie explained the form to Mr. Miller, and he executed the form, agreeing to permit a search of the house. At the bottom, the form states:

> "I understand that I have the right to refuse to consent to the search described above and to refuse to sign this form.
>
> I further state that no promises, threats, force or physical or mental coercion of any kind whatsoever have been used against me to get me to consent to the search described above or to sign this form."

Id. No threats or promises were made to Mr. Miller to induce him to consent to the search.

Ebone Smiley, who at the time of these events was approximately eight years old, testified that in July 2003 she was living at her grandmother's residence at 4493 Kossuth. On July 25, 2003, she and her mother took her grandmother to the clinic, where they

remained for several hours.[3]  The events that form the basis for Defendant's motions took place while they were gone.  She testified that when she left the house, it was straight and clean, but that when she returned with her mother and grandmother, the house was all torn up -- there were clothes all around, the bedroom door was knocked down, the back door was damaged and had a footprint on it, and the bed was turned over.  She also testified that following their return, she overhead a conversation between her mother, another individual named "Mike," and Charles Miller, in which Charles Miller said that while her cousin Robert was leaving, the police rushed into the house.

Ms. Smiley testified that her uncle, Charles Miller, did not live at the residence while he was alive.  She further testified that at the time of these events, Defendant Thompson did not live at 4493 Kossuth, but rather lived fairly far from there with her Uncle Ben in St. Louis.

To the extent Ms. Smiley's testimony differs from that of Officer McMurray, based upon the entire record, the demeanor of the witnesses and their opportunity to have observed the events, the Court credits the testimony of Officer McMurray over that of Ms. Smiley, who was eight years old at the time and was not present when the events at issue transpired.[4]

---

[3]  Defendant's mother and grandmother, who were present in the courtroom, did not testify.

[4]  In many respects Ms. Smiley's testimony does not actually conflict with that of the officer.  For example, Ms. Smiley has no information regarding the circumstances surrounding the signing of the Consent to Search form.  Moreover, while she testified that the there was clothing on the floor and the room was in disarray, the officers acknowledge that they searched the bedroom, which search was completed before Ms. Smiley returned home.  The Court does not find credible Ms. Smiley's testimony regarding the condition of the doors or her recollection from

**CONCLUSIONS OF LAW**

**A.  Admissibility of Grand Jury Testimony of Charles Miller**

At the close of testimony at the initial hearing on September 8, the government requested that the Court admit, for purposes of the hearing, the grand jury testimony of Charles Miller.  (Ex. A, attached to Gov't. Resp. to Defendant's Motions to Suppress, Doc. No. 25, filed under seal).  Mr. Miller testified under oath before the grand jury on August 21, 2003, and he has since passed away.  At that time, Defendant objected, asserting that the admission would violate Defendant's right of confrontation.  The government contends that the testimony is admissible in connection with this suppression hearing, asserting that hearsay is admissible at a suppression hearing.  See United States v. Raddatz, 447 U.S. 667, 679 (1980) ("At a suppression hearing, the court may rely on hearsay and other evidence, even though that evidence may not be admissible at trial.");  Fed. Rules Evid. 104(a), 1101(d)(1).  The undersigned agrees.

In support of his assertion that admission of Mr. Miller's grand jury testimony would be improper, Defendant cites but one case:  Crawford v. Washington, 541 U.S. 36 (2004).  "Crawford holds that no prior testimonial statement made by a declarant who does not testify at the trial may be admitted against a defendant unless the declarant is unavailable to testify and the defendant had a prior opportunity to cross-examine him or her."  United States v. McClain, 377 F.3d 219, 221 (2d Cir. 2004) (citing Crawford, 541 U.S. at 61-62).  The Court agrees that Mr. Miller's prior grand jury testimony would

---

three years ago of the conversation she overheard between Mr. Miller and her mother and grandmother.

qualify as a "testimonial statement" at trial.  See Evans v. Luebbers, 371 F.3d 438, 445

(8th Cir. 2004) ("[B]y its terms Crawford's holding applies 'to prior testimony at a

preliminary hearing, before a grand jury, or at a formal trial; and to police

interrogations.'") (quoting Crawford, 541 U.S. at 68); accord United States v. Bruno, 383

F.3d 65, 78 (2d Cir. 2004) (grand jury testimony of unavailable witnesses constituted

testimonial hearsay).

The issue before the Court in Crawford, however, was the admissibility of such

testimonial statements at trial.  See United States v. Lee, 374 F.3d 637, 644 (8th Cir.

2004) (recognizing, in applying Crawford, that "[t]he central function of [the

confrontation clause] is to protect individuals from the use of ex parte statements as

evidence against them in a criminal trial." (emphasis added)); accord, Pennsylvania v.

Ritchie, 480 U.S. 48, 53 (1987) (plurality opinion) ("The opinions of this Court show that

the right to confrontation is a trial right, designed to prevent improper restrictions on the

types of questions that defense counsel may ask during cross-examination.") (emphasis in

original).  At issue here is not the admissibility of Mr. Miller's grand jury testimony at

trial, but rather its admissibility in connection with the determination of a preliminary

evidentiary issue, namely, whether the officers had or reasonably believed they had

consent, such that evidence obtained as a result of the search of the Kossuth residence is

admissible.

As the government notes, it has long been established that hearsay is admissible at

a pretrial suppression hearing for purposes of ruling on the admissibility of other

evidence.  Raddatz, 447 U.S. at 679; Gerstein v. Pugh, 420 U.S. 103, 119, 122-23 (1975)

(probable cause determination for purpose of pretrial detention does not require "the full panoply of adversary safeguards – counsel, confrontation, cross-examination, and compulsory process for witnesses"); United States v. Matlock, 415 U.S. 164, 173 (1974) (rules of evidence applicable in criminal trials are not applicable in pre-trial hearings before a judge to determine evidentiary matters, such as the admissibility of evidence).

There is nothing in the Crawford opinion that suggests an intent to change this long-standing principle permitting the admission of hearsay at a suppression hearing. Nor is there any such suggestion in the cases that followed the March 2004 Crawford decision. To the contrary, the cases after Crawford reaffirm the admissibility of hearsay at suppression hearings. See, e.g., United States v. Del Rosario, 388 F.3d 1, 12 n.5 (1st Cir. 2004)("testimony given at a suppression hearing is not subject to the usual proscriptions against hearsay evidence"), vacated on other grounds (Booker), Pacheco v. United States, 125 S.Ct. 1866 (2005); United States v. Miramonted, 365 F.3d 902, 904 (10th Cir. 2004) (hearsay testimony is admissible at suppression hearings and should be considered by a district court in determining probable cause); accord United States v. Clark, 136 Fed. Appx. 831, 833 (6th Cir. 2005) (acknowledging admissibility at suppression hearing of hearsay testimony by officers that the defendant and his mother provided consent to search); cf. United States v. Dorsey, 418 F.3d 1038, 1044 (9th Cir. 2005) (out-of-court statement to officers regarding defendant's location not hearsay because offered as evidence that officers had probable cause to arrest and not offered for the truth of the matter).

Moreover, courts applying <u>Crawford</u> have also declined to extend its holding to other non-trial types of court proceedings. <u>See</u>, <u>e.g.</u>, <u>United States v. Martinez</u>, 413 F.3d 239, 242-43 (2d Cir. 2005) (<u>Crawford</u> did not change prior law recognizing that right of confrontation does not apply to sentencing context and does not prohibit consideration of hearsay in sentencing proceedings); <u>United States v. Martin</u>, 382 F.3d 840, 844 & n.4 (8th Cir. 2004) (<u>Crawford</u> not applicable in supervised release revocation hearing).

Thus, <u>Crawford</u> does not change the long-standing prior precedent that permits the use of hearsay in preliminary proceedings dealing with the admissibility of evidence. Such testimony may be admitted if the court is satisfied that there is no serious reason to doubt that the out-of-court statement was made and no reason to seriously doubt the statement's truthfulness. <u>See</u> <u>United States v. Maza</u>, 93 F.3d 1390, 1396 (8th Cir. 1996). Here, there is no question that Mr. Miller's out-of-court statements were made, and the officers' testimony regarding Mr. Miller's statements at the time of the arrest were admitted without objection. Nor is there any reason to believe that Mr. Miller, who was Defendant's own uncle, had any reason to testify untruthfully regarding these events. As such, Mr. Miller's grand jury testimony should be admitted, for purposes of this hearing only, to the extent it bears on the suppression issues.

Further, Defendant has waived any confrontation clause exception related to this testimony. At the start of the evidentiary hearing on September 8, the government challenged Defendant's standing or privacy interest, asserting that at the time of Defendant's two arrests related to the incident, Defendant provided an address other than 4493 Kossuth as his residence. In response to the government's challenge, Defendant

referenced the very same grand jury testimony of Mr. Miller in support of his assertion that he lived at the Kossuth address at the time of the search, and Defendant expressly invited the Court to review the transcript of that grand jury testimony. Defendant also referenced, but did not offer, the out-of-court statements or testimony of two other witnesses in support of Defendant's residence. Based upon the testimony of the witnesses referenced by Defendant -- including, primarily, the grand jury testimony of Mr. Miller -- the government conceded the issue of standing and offered the grand jury testimony of Mr. Miller. Defendant raised no objection at that time – objecting only far later, at the end of the hearing that day, when the government offered that same testimony on the issue of consent. But Defendant cannot have it both ways; he cannot submit the grand jury testimony of Mr. Miller as his primary evidence to prove that Defendant possessed a sufficient privacy interest,[5] and then object to that same testimony on the issue of whether consent was provided.

Finally, even if the grand jury testimony of Mr. Miller were to be disregarded entirely, this Court's factual and legal findings would remain the same.[6]

---

[5] It is important to note that there was scant other evidence offered at the hearing to support Defendant's assertion that he had a privacy interest in the Kossuth residence. The only witness called by Defendant, Ebone Smiley, testified unequivocally that Defendant did not live at the Kossuth residence at the time of the search, but rather lived at another residence some distance away.

[6] The undersigned did not review the grand jury transcript until after all of the testimony was complete and the undersigned had determined the facts based solely on the live testimony. Only then did this Court review the testimony of Mr. Miller, and that review did not alter the undersigned's determination of the facts in any way.

## B.  **Consent to Search**

A warrantless search may be conducted based on an individual's voluntary consent.  Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973).  Such consent may be express or implied, and while the consent must be voluntary, it need not be knowing and intelligent.  Id. at 235; United States v. Hoggard, 254 F.3d 744, 746 (8th Cir. 2001) (consent valid though defendant led to believe pictures seized were not items to be sought).  A consent to search is voluntary if it is the product of free choice, the individual's will is not overborne, and the consent is not given under coercion or duress.

In determining whether the prosecution has met its burden to demonstrate a consent is voluntary, courts look to both the characteristics of the individual and the details of the environment in which the consent was given.  United States v. Chaidez, 906 F.2d 377, 381 (8th Cir. 1990).  Voluntariness is a fact question to be determined from the totality of the circumstances present.  Schneckloth, 412 U.S. at 226-227; United States v. Matlock, 415 U.S. 164 (1964).  The factors to be considered include the person's age, general intelligence, and education; whether the person was intoxicated or under the influence of drugs; whether the person consented after being informed of his or her right to withhold consent of his Miranda rights; and whether the person was aware of the protections afforded to suspected criminals by the legal system due to having previously been arrested.  Chaidez, 906 F.2d at 381.  Among the factors to be considered related to the environment surrounding the consent, courts examine:  the length of time a person is detained and questioned; whether the person was threatened, physically intimidated, or punished by the police; whether the defendant relied upon promises or misrepresentations

made by the police; whether the defendant was in custody; whether the consent occurred in a public or secluded location; and whether the defendant objected to the search or stood silently by while the search occurred." Id. The foregoing factors are not to be applied mechanically, and no single factor is dispositive. Schneckloth, 412 U.S. at 226-27; Chaidez, 906 F.2d at 381.

Valid consent to search may be given by a party "who possessed a common authority over or other significant relationship to the premises or effects sought to be inspected." Matlock, 415 U.S. at 171. See United States v. Richard, 994 F.2d 244, 250 (5th Cir. 1993) (co-occupant of a motel room had authority to consent to a search of a room she had been staying in for several days). The absence of any legal ownership interest in the premises is not controlling. In general, any person who has a reasonable expectation of privacy in the place to be searched, any person with common authority over the premises or other sufficient relationship to the place or the effects being searched, can give valid consent. Matlock, 415 U.S. at 171.

Even if the consenting party lacked actual authority to give valid consent to search, official reliance on the consent may validate the search if it was reasonable for the law enforcement officers to believe the consenting party had the required relationship to or authority over the premises. Illinois v. Rodriguez, 497 U.S. 177, 187-188 (1990); United States v. Alcantar, 271 F.3d 731, 738 (8th Cir. 2001), cert. denied, 535 U.S. 964 (2002); Iron Wing v. United States, 34 F.3d 662, 665 (8th Cir. 1994). "The relevant inquiry is whether the facts available would have justified a reasonable officer in the belief that the consenting party had authority over the premises." Matlock, 415 U.S. at 171. The test

for measuring the scope of the consent is also one of objective reasonableness, "what would the typical reasonable person have understood by the exchange between the officer and the individual." United States v. Adams, 346 F.3d 1165, 1171 (8th Cir. 2003) (reasonable to believe from actions of defendant's girlfriend that she provided consent to search residence).

In this case, Defendant has not challenged the authority of Mr. Miller to consent to a search of the residence. Rather, Defendant's argument is that Mr. Miller did not consent, and that the police forced their way into the residence. Having listened to the testimony, observed the demeanor of the witnesses, and reviewed the evidence, including the written Consent to Search form signed by Mr. Miller, the Court rejects Defendant's argument that the police forced entry and finds that Mr. Miller did, in fact, permit entry, consent to the search, and advise the police where Defendant could be found.

The Court also finds that Mr. Miller's consent was voluntary. Although Mr. Miller was not given any Miranda warnings or initially advised that he could refuse to consent, the officers clearly advised Mr. Miller why they wanted to enter the premises. He appeared to understand what was being requested, and there is no suggestion that he was under the influence of any drugs or alcohol. Though several of the officers who entered the premises had their firearms drawn, that is not enough to render Mr. Miller's consent involuntary. Mr. Miller was not a suspect and was not in custody; he was not detained or threatened; the request was made in the middle of the day, at Mr. Miller's sister's home; and he at no time objected to the search. After the officers located and secured Defendant Thompson, Mr. Miller signed a Consent to Search form in which he

acknowledged that he had the right to refuse consent; the right to refuse to sign the form; and that "no promises, threats, force or physical or mental coercion of any kind whatsoever" had been used to get him to consent to the search. Govt. Ex. B.

Although not specifically challenged, on this record the Court finds that Mr. Miller possessed sufficient authority to consent to an entry onto and a search of the premises. The evidence is uncontroverted that the owner of the residence was not present, and Mr. Miller was charged with watching the premises for her while she was gone. See Adams, 346 F.3d at 1170-71; United States v. Denberg, 212 F.3d 987, 992 (7th Cir. 2000) (girlfriend who lived at residence had actual authority to consent to search entire residence, including locked gun cabinet, where girlfriend had access to cabinet); United States v. Hall, 979 F.2d 77, 79 (7th Cir. 1992) (owner of home in which tenant rented room had authority to consent to search of tenant's room where homeowner owned furniture, door not locked, and homeowner had access to room).

Even if Mr. Miller lacked authority to give valid consent to search, it was reasonable for the law enforcement officers to believe that he possessed authority to consent. He was an adult, and he opened the door in response to the officers' knock. The officers had no knowledge of who owned the premises, and Mr. Miller advised the officers that his sister owned the residence, that she was ill, and that he was looking after the house for her. After they secured the premises, Mr. Miller executed a written consent to search, never suggesting he lacked authority. As such, at a minimum, Mr. Miller had apparent authority to consent to the search.

## C.  **Defendant's Arrest**

Police officers may briefly stop an individual for an investigative purpose when they have a reasonable belief that "criminal activity may be afoot."  <u>Terry v. Ohio</u>, 392 U.S. 1, 30 (1968); <u>United States v. Bell</u>, 183 F.3d 746, 749 (8th Cir. 1999).  The level of proof necessary is "considerably less than proof of wrongdoing by a preponderance of the evidence."  <u>United States v. Sokolow</u>, 490 U.S. 1, 7 (1989).  The reasonable belief requires suspicion based on "'particularized, objective facts which, taken together with rational inferences from those facts, reasonably warrant[] suspicion that a crime [is] being committed.'"  <u>United States v. Beck</u>, 140 F.3d 1129, 1136 (8th Cir. 1998) (quoting <u>United States v. Martin</u>, 706 F.2d 263, 265 (8th Cir. 1983)).  In assessing the reasonableness of the suspicion, officers may "draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.'"  <u>United States v. Arvizu</u>, 534 U.S. 266, 273 (2002) (quoting <u>United States v. Cortez</u>, 499 U.S. 411, 418 (1981)).

In this case, a confidential informant, who had proven reliable in the past, advised the officers that "Dee" and others had used a stolen minivan in connection with the robbery that had occurred earlier that day; a description of the van and its plates was provided, together with information about where the van could be found; the officers found the van at the location the CI had provided and confirmed that both the van and the plates were stolen; bystanders thereafter identified the van as belonging to "Dee" and pointed out the residence on Kossuth where Dee could be found; and Mr. Miller

thereafter confirmed that Dee was his nephew, and that he was in the residence.  On these facts, the officers had a reasonable belief that Defendant was engaged in criminal activity.  See United States v. Bustos-Torres, 396 F.3d 935, 942-43 (8th Cir.), cert. denied, 125 S.Ct. 203 (2005) (reasonable suspicion for Terry stop where officers, in area known for drug activity, saw individual entering defendant's car after same individual had been seen conducting probable drug transaction with another car a few minutes earlier); United States v. Spotts, 275 F.3d 714, 718, 720 (8th Cir. 2002) (reasonable suspicion to stop defendant and ask him to get out of truck where truck had been seen driving by residence police were searching for methamphetamine lab and the officers had intelligence reports that the defendant dealt methamphetamine); United States v. Gonzalez, 220 F.3d 922, 925 (8th Cir. 2000) (reasonable suspicion of drug transport based on accomplice's information, including particulars of vehicle and direction of travel).

Although the government in this case concedes that an arrest occurred when Defendant acceded to the officers' directive that he lay face down, the undersigned disagrees.  Under Terry, where an officer has a reasonable, articulable suspicion that the individual who was stopped might be armed and presently dangerous, he may take steps to maintain the status quo, including a limited pat-down for weapons.  Pennsylvania v. Mimms, 434 U.S. 106, 111-12 (1977); Terry v. Ohio, 392 U.S. 1, 27 (1968).  The test is an objective one, and does not turn on the subjective belief of the officer.  United States v. Roggeman, 279 F.3d 573, 577 (8th Cir.), cert. denied, 537 U.S. 879 (2002).  The officer need not be absolutely certain the person is armed; the level of suspicion

necessary is far less than a preponderance of the evidence of wrongdoing, and is less than is required for probable cause.  Id.

As the Court noted in Terry, at issue is "more than the governmental interest in investigating crimes; in addition, there is the more immediate interest of the police officer in taking steps to assure himself that the person with whom he is dealing is not armed with a weapon that could unexpectedly and fatally be used against him."  Terry, 392 U.S. at 23.  "[T]he issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger."  Id. at 27.  Each case must be decided on its own facts, in light of the totality of the circumstances. Roggeman, 279 F.3d at 577-78.

Here, the criminal activity the officers were investigating involved the burglary of a gun shop and the theft of numerous firearms.  They had confirmed that the minivan associated with the burglary was "Dee's" vehicle and that it was stolen.  Although Defendant, who was naked, clearly did not have a weapon on his person, there were tools -- including a crowbar -- and other items nearby, and the officers had no way to know whether Defendant had easy access to a firearm or other weapon in the bedroom.  It was therefore objectively reasonable for the officers to have safety concerns.  As such, the officers' actions in entering the room with their firearms drawn and directing Defendant to lay face down was a reasonable means of maintaining the status-quo, and did not exceed the scope of the Terry stop.  See United States v. Fisher, 364 F.3d 970, 972-74 (8th Cir. 2004) (scope of Terry stop not exceeded where officers who stopped individual suspected of possessing firearm drew their weapons, ordered defendant to stop, and

ordered him to raise his hands); United States v. Thomas, 249 F.3d 725, 729 (8th Cir. 2001) ("During a Terry stop, officers can check for weapons and may take any additional steps that are reasonably necessary to protect their personal safety and to maintain the status quo during the course of the stop.") (quoting United States v. Hensley, 469 U.S. 221, 232 (1985)).

Even if one assumes that the officers' actions exceeded the scope of a Terry stop, the officers also had probable cause to arrest Defendant upon their entry into the bedroom. Probable cause is measured objectively and exists "when at the moment of arrest police have knowledge of facts and circumstances grounded in reasonably trustworthy information sufficient to warrant a belief by a prudent person that an offense has been or is being committed by the person to be arrested." United States v. Oropesa, 316 F.3d 762, 768 (8th Cir. 2003) (quoting United States v. Hartje, 251 F.3d 771, 775 (8th Cir. 2001). The above-listed facts, coupled with the possible burglary tools they observed in plain sight upon entry into the bedroom, provided probable cause to arrest Defendant both in connection with the Trail Creek burglary and for his possession of a stolen vehicle. See United States v. Powell, 39 F.3d 894, 895-96 (8th Cir. 1994) (information from reliable source, corroborated by observation of unusual pedestrian activity consistent with drug sales, sufficient for probable cause to arrest); United States v. Sherrill, 27 F.3d 344, 346 (8th Cir. 1994) (same). Once the officers located the firearm, they also had probable cause to arrest him for possession of a concealed firearm.

### D.  Defendant's Statements

1.  Pre-arrest Statements

Prior to placing Defendant under arrest and advising him of his rights under

Miranda, the officers asked Defendant his name and asked him where his clothes were.

As set forth above, when the officers asked these questions, Defendant was not in

custody, and the officers were entitled to ask Defendant to identify himself in connection

with their investigative detention and to locate his pants so that they could conduct their

investigation with Defendant clothed.  Terry, 392 U.S. 22-24; United States v. Ortiz-

Monroy, 332 F.3d 525, 529 (8th Cir. 2003) ("Once a lawful stop has occurred, officers

are entitled to conduct an investigation 'reasonably related in scope to the circumstances

which justified the interference in the first place.'") (citations omitted).

Even if Defendant were deemed to be in custody when the officers asked these

two questions, Defendant's responses would not be subject to suppression.  Miranda

warnings are required only when the defendant also is subject to police interrogation.

Illinois v. Perkins, 496 U.S. 292, 297 (1990).  Interrogation has been defined as "express

questioning or its functional equivalent," which includes "words or actions on the part of

the police . . . that the police should know are reasonably likely to elicit an incriminating

response from the suspect."  Rhode Island v. Innis, 466 U.S. 291, 300-01 (1980).

Routine questions, such as obtaining a defendant's name and other booking questions, are

in the nature of record keeping and are not considered to be "interrogation."

Pennsylvania v. Muniz, 496 U.S. 582, 600 - 602 (1990); United States v. Brown, 101

F.3d 1272, 1274-5 (8th Cir. 1996).  Nor was the officer's question asking Defendant

where his clothing was located reasonably likely to elicit an incriminating response.  See

Innis, 446 U.S. at 300-01; United States v. Mendoza-Gonzalez, 363 F.3d 788, 795 (8th

Cir. 2004) (where defendant during custodial search asked to use phone, officer asked

"why" and defendant replied he "was going to jail," question by officer not

interrogation); United States v. Hawkins, 102 F.3d 973, 975 (8th Cir. 1996) (no

"interrogation" where defendant's statement prompted by discovery of cocaine); United

States v. Henderson, 770 F.2d 724, 728 (8th Cir. 1985) (discussion in nature of

conversation "normally attendant to arrest and custody," not interrogation) (quoting Innis,

446 U.S. at 300-01).

### 2.  Post-arrest Statements

After the officers located the firearm, Defendant was advised that he was under

arrest and of his rights under Miranda.  Defendant thereafter made a statement about the

firearm and stated that the pants were not his.  When the officers later located the gun tag

and asked Defendant about the tag, Defendant stated that it did not matter because he was

going to "take the case."

A defendant may knowingly and intelligently waive his rights and agree to answer

questions.  Miranda v. Arizona, 384 U.S. 436, 479 (1966).  When the prosecution seeks

to introduce in evidence a statement made by a defendant while in custody, it has the

burden of showing by a preponderance of the evidence that the statement was made after

a voluntary, knowing, and intelligent waiver of Miranda rights by the defendant.

Colorado v. Connelly, 479 U.S. 157 (1986).  The court must examine the totality of the

circumstances surrounding the interrogation to determine whether the waiver was the

product of a free and deliberate choice, rather than intimidation, coercion, or deception, and whether the waiver was made with an awareness of the right being abandoned and the consequences of the decision to abandon it. Moran v. Burbine, 475 U.S. 412 (1986). The statement must be voluntary and not the product of any police conduct by which the defendant's will is overborne. Connelly, 479 U.S. at 170; Haynes v. Washington, 373 U.S. 503 (1963). "The requirement that Miranda warnings be given does not, of course, dispense with the voluntariness inquiry." Dickerson v. United States, 530 U.S. 428, 444 (2000). As the Supreme Court has recognized, however, "[c]ases in which a defendant can make a colorable argument that a self-incriminating statement was 'compelled' despite the fact that law enforcement authorities adhered to the dictates of Miranda, are rare." Berkemer v. McCarty, 468 U.S. 420, 433 n.20 (1984). See Dickerson, 530 U.S. at 444.

Defendant's post-arrest statements are not subject to suppression. Prior to making these statements, Defendant was advised of his rights under Miranda, and he acknowledged that he understood those rights. At the time, Defendant was 30 years old and he had prior experience with law enforcement. He appeared to understand what was being said to him, and there is no evidence that he was under the influence of drugs or alcohol. The questioning took place in the middle of the day, in his grandmother's home, and no threats or promises were made to induce either Defendant's waiver or the statements made thereafter. As such, the Court finds both Defendant's waiver of his Miranda rights and his statements to be voluntary and intelligent.

### E.  **Evidence Seized from the Residence**

The police were authorized to seize Defendant's wallet and the gun tag found in the wallet, and other items located on his person or in his clothing incident to Defendant's arrest.  See New York v. Belton, 453 U.S. 454, 458-59 (1981);  United States v. Robinson, 414 U.S. 218, 224 (1973);  United States v. Pratt, 355 F.3d 1119, 1121, 1124 (8th Cir. 2004).  The officers were also authorized to seize the tools, as they were in plain view, and in light of the nature of the offense under investigation, their incriminating character was immediately apparent.  United States v. Murphy, 261 F.3d 741, 743 (8th Cir. 2001) (police authorized to seize items in plain view when incriminating character of objects is immediately apparent); United States v. Weinbender, 109 F.3d 1327, 1330 (8th Cir. 1997).  The same is true with respect to the firearm, as the police did not do anything unlawful that caused them to be able to see the firearm; it came into view as a natural consequence of other lawful police conduct.  United States v. Parker, 412 F.3d 1000, 1002 (8th Cir. 2005).  Even if they had not discovered the firearm prior to Defendant's arrest, they inevitably would have discovered the firearm following his arrest.  The gun was located within close proximity to Defendant, and undoubtedly the officers would have had Defendant get dressed prior to taking him into custody.  Chimel v. California, 395 U.S. 752, 763 (1969); United States v. Morales, 923 F.2d 621, 626 (8th Cir. 1991) (search of defendant's luggage following valid arrest authorized where luggage was within immediate control of the defendant).  Although the timing and location of a few of the other items seized was not detailed at the hearing, these items were properly seized

pursuant to Mr. Miller's written consent, which permitted a search of the entire house.

Accordingly,

**IT IS HEREBY RECOMMENDED** that Defendant's Motion to Suppress Evidence and Statements [Doc. No. 17] be **denied**.

Trial in this matter has been set for **Tuesday, January 3, 2006, at 9:30 a.m.**, before the **Honorable Henry E. Autrey**.

The parties are advised that they have eleven (11) days in which to file written objections to this report and recommendation pursuant to 28 U.S.C. §636(b)(1), unless an extension of time for good cause is obtained, and that failure to file timely objections may result in a waiver of the right to appeal questions of fact. See Thompson v. Nix, 897 F.2d 356 (8th Cir.1990).

_Audrey G. Fleissig_
AUDREY G. FLEISSIG
United States Magistrate Judge

Dated this 14th day of November, 2005.